DURHAM et al. v. PIERSON et al.—197 S. W. (2d) 898.

Western Section.   June 11, 1946.

Petition for Certiorari denied by Supreme Court, November 30, 1946.

512

Steele & Steele and James T. Haynes, all of Ripley, for appellants.

C. S. Carney, Jr., of Ripley, for appellees.

KETCHUM, J. This is a bill of interpleader filed by the complainant as administrator of the estate of Sam G. Neville, deceased, to have determined the rights of rival claimants to the sum of $4,965.46 in his hands upon the final settlement of the estate of his intestate. The fund in controversy is claimed, on the one hand, by Mrs. Ella O'Daniel, a sister, and certain nephews and nieces of Mr. Neville, who assert their right thereto as his next of kin and the distributees of his estate; and on the other hand, by Mrs. Birdie C. Pierson and Mrs. Lillie C. Scott, sisters of Mrs. Lulu C. Neville, deceased, wife of Sam G. Neville, who claim it as legatees under her will. Their contention is that the fund in controversy is a part of a trust fund of $6,090 in the hands of Mr. Neville which belonged to his wife and in which he was given a life estate under her will, with remainder to Mrs. Pierson and

Mrs. Scott. The chancellor sustained their contention and entered a decree directing the payment of the fee allowed complainant's solicitor and the costs out of the fund, and that the balance remaining be paid to Mrs. Pierson and Mrs. Scott in equal shares. From this decree the distributees of Mr. Neville have appealed and assigned errors.

There is no serious dispute about the facts. Mr. Neville died on August 15, 1941, at the age of 83 years. He came to Tennessee from North Carolina to live some 45 or 50 years before his death. He first taught school for a time at Henning and while there he married Miss Lulu C. Cobb who was or had been one of his pupils. There were no children of this marriage. From Henning they moved to Knoxville where they lived until the last of 1918 or the first of 1919. Mr. Neville had been unsuccessfull in business there and came to Ripley where they lived for a time in the home of Mr. Tom Cobb, Mrs. Neville's father. Mrs. Scott testifies that they were "down and out when he came to us" and that "we were keeping them." About this time he was struck by a street car and had an arm broken. Mrs. Scott says as soon as he had recovered sufficiently her father let him work in the strawberries and that he was still doing this after her father's death which occurred in May, 1919. From 1920 or 1921 he had an insurance agency in Ripley.

Mrs. Neville received about $4,500 from her father's estate in May 1920. She loaned this to her father Charles H. Cobb, and also sold him her interest in the homestead and dower tract for $900.00. He paid her interest on this $5,400 at the rate of ten per cent in monthly payments of $45.00 for about a year; the loan was then increased to $6,000 and the interest was paid in monthly payments of $50.00 until the last of 1928. About that time

Charles H. Cobb organized and became president of a corporation known as the Canvas Decoy Company, and he proposed to give his sister $6,000 of the preferred stock in this company in satisfaction of his $6,000 note. This proposition was accepted and the stock was issued to her in January, 1929. Dividends of 8 per cent were paid on this stock for three years. No dividends have been paid since 1931, and the stock is now regarded as worthless, although the company is still in business. Altogether Mrs. Neville received between 1921 and 1931 by way of interest on the loan to her brother and dividends on the Canvas Decoy Company stock the sum of $6,090. These payments were made by checks drawn in her favor and endorsed by her and delivered to her husband who deposited them in the usual course of business in his bank account.

Mrs. Neville died on December 30, 1939, leaving the following will which was duly admitted to probate:

"In grateful love for my two sisters Mrs. Lillie C. Scott and Mrs. Birdie C. Pierson, and their heirs, they who have done so much for me through all the years, I wish to leave them everything I might be heir to after the death of Sam Neville and myself. I do this of my own free will. All previous bequests are null and void.

"This Sept. 9, 1937. (signed) Lulu C. Neville."

Mrs. Pierson and Mrs. Scott construed this as giving Mr. Neville a life interest in Mrs. Neville's estate with remainder to them at his death.

Mrs. Pierson testified that she discussed the matter with Mr. Neville and tried to reach an understanding with him about Mrs. Neville's estate but without success, so she wrote out some questions and requested him to answer them. He wrote out his answers to this question-

naire and returned it to her. The questions and his answers thereto are as follows:

"Mr. S. G. Neville:

Will you please answer the following questions Yes or No?

The letter that you have from Charley Cobb states that from time to time he had sent to Lulu at least $4500.

Question: Did she receive this?

(Ans.) She received whatever was sent.

Did she sign the checks?

(Ans.) She endorsed whatever was sent.

Were they made to her? (Ans.) Yes.

Were they made to you? (Ans.) No.

Do not the securities that you have (either stocks, bonds, Postal savings, bank time deposits, or what not) represent this $4500 of hers left to her by our father? (Ans.) No.

And are we, Lillie Scott and myself, entitled to this much ($4500) of said securities under her will?

(Ans.) You and Lillie whatever is left of her estate at my death.

Of course we know that you will be entitled to the interest on same as long as you live.

Please answer questions where you find question marks and return this to me.

Thanks.

(signed) Birdie C. Pierson.

(Ans.) I kept no acct of dividends received. The record ought to show. I will state that all the checks came to Lulu and endorsed by her—placed in the bank by consent to my account, and she or I could draw checks against it, and we used all dividends this way to pay our expenses, or for any other purpose that was legitimate."

516

The answers to this questionnaire are not signed by Mr. Neville but are in his handwriting.

It does not appear from the record how long Mr. and Mrs. Neville lived with the Cobb family after Mr. Cobb's death. Both Mrs. Scott and Mrs. Pierson say that he was "down and out" and Mrs. Scott says they arranged with Mrs. Cobb to share in the payment of their board and expenses, but that Mr. Neville afterwards reimbursed them for these advances.

It does not appear from the record what Mr. Neville's earnings were in the ten year period from 1921 to 1931. This is the time he was down and out and getting started in the insurance business and we feel warranted in finding as a fact that the proceeds of the interest and dividend checks received by Mrs. Neville during that time were used for their living expenses as stated by Mr. Neville in his answers to the questionnaire. There is no evidence, either oral or in writing, of any agreement between the parties that these checks were to be deposited in a separate account, or treated as a trust fund for Mrs. Neville's benefit, or used for any specific purpose; but they were with her knowledge and consent deposited to Mr. Neville's account and in this way commingled with his funds. On this evidence we do not think the existence of a trust fund will be implied.

Nor is there any effort to trace the proceeds of these checks into the purchase of any of the assets of Mr. Neville's estate that came into the hands of his administrator. Mr. Neville in his answer to the questionnaire stated that they were not so applied.

Mr. Neville's pass books show that he had a balance of $1,054.30 on deposit in the First State Bank on February 27, 1932; and $296.78 in the Ripley Savings Bank & Trust Company on November first of that year.

So far as shown by the record he had no other assets of value at that time. When the Ripley Savings Bank & Trust Company failed in May, 1939, he had on deposit and in certificates of deposit the sum of $5,590. He was reimbursed $5,000 on account of this loss by the FDIC. $3,750 of this $5,000 was then invested in the purchase of U. S. postal savings notes which were afterwards converted into U. S. bonds. At the time of his death the only assets of value that came into the hands of his administrator consisted of $4,000 of U. S. bonds, serial D, $800 of stock in the Bank of Ripley, $1,802.37 on deposit in bank and his insurance agency from which less than $600 was realized. It thus appears that the $6,090 derived from the interest and dividend payments to Mrs. Neville during the years 1921 to 1931 are not traced into the assets which came into the hands of Mr. Neville's administrator.

In McDowell v. McDowell, 144 Tenn. 452, 458, 234 S. W. 319, 320, 18 A. L. R. 623, Mr. Justice Green, speaking for the court, says: ''In order to follow trust money there must be specific property, capable of being identified, into which the trust money has gone''; and quoting from the opinion in Moffitt v. McDonald, 30 Tenn. 457, he further says: ''It must, however, be clearly established, that the property upon which the trust is sought to be fastened, has been paid for out of the specific trust fund. It is not sufficient to prove that the purchaser of the property had a fund belonging to another in his hands, unless the employment of that particular fund in the purchase be also proved.''

And in Lowe v. Jones, 192 Mass. 94, 78 N. E. 402, 404, 6 L. R. A., N. S., 487, 116 Am. St. Rep. 225, 7 Ann. Cas. 551, which is cited with approval in the McDowell case, supra, the court adopted the following statement

of the rule as laid down in the case of Little v. Chadwick, 151 Mass. 109, 23 N. E. 1005, 7 L. R. A. 570:

"When trust money becomes so mixed up with the trustee's individual funds that it is impossible to trace and identify it as entering into some specific property, the trust ceases. The court will go as far as it can in thus tracing and following trust money, but when as a matter of fact it cannot be traced, the equitable right of the cestui que trust to follow it fails. . . . The great weight of authority, both in England and America is in accordance with the rule in Little v. Chadwick, above stated."

The holding in the McDowell case was approved in the case of Bragg v. Osborn, 147 Tenn. 381, 248 S. W. 19, 20, which is relied upon by the appellees.

The appellees, Mrs. Scott and Mrs. Pierson claim the fund in controversy under the doctrine of Knatchbull v. Hallett, L. R. 13 Ch. Div., 696 which is stated in Bragg v. Osborn, supra, in the following language:

"Where a trustee blends in a bank account his own money with a beneficiary's, from which account the trustee subsequently withdraws funds, the withdrawals will be presumed to be the trustee's own funds, which he had a right to withdraw, and the balance will be presumed to include the beneficiary's funds, which the trustee had no right to use."

This doctrine as we understand it, has no application under the facts of the present case because (1) the proof does not warrant the finding that the interest and dividend checks which Mrs. Neville endorsed and delivered to her husband, amounting to $6,090, constituted a trust fund; and (2) because the appellees have wholly failed to trace the funds into the purchase of the assets which came into the hands of Mr. Neville's administrator.

There is no claim that Mr. Neville asserted any title to these interest and dividend checks by virtue of having reduced them to his possession, so the case of Telico Bank & Trust Co. v. Loomis, 147 Tenn. 158, 246 S. W. 21, upon which the chancellor based his conclusion, has no application. The checks were for income and Mrs. Neville turned them over to her husband and they were deposited to his account with her consent and the proceeds were used for their support. This did not create a trust for her benefit.

Mr. Neville never asserted any claim to Mrs. Neville's certificates for 60 shares of the Canvas Decoy Company stock, and they remain a part of Mrs. Neville's estate and passed to Mrs. Pierson and Mrs. Scott under her will, for whatever they may be worth. Mr. Cobb says he is going to try to put the company on a dividend paying basis again.

We think the weight of the evidence is against the chancellor's finding and decree, and that his decree should be reversed and a decree entered awarding the fund in the hands of the Clerk & Master to Mrs. O'Daniel and other next of kin of Mr. Neville, or their solicitors, in accordance with their interests therein under the statutes of distribution.

The costs will be paid out of the funds in the hands of the Clerk and Master. The cause will be remanded for the distribution of the fund and for such further proceedings as may be necessary.

Anderson, P. J., and Baptist, J., concur.